IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WENDELL H. STONE COMPANY, INC. d/b/a STONE & COMPANY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LKQ CORPORATION, a Delaware corporation<br><br>Defendant. | Case No. 1:16-cv-07648<br><br>Hon. Matthew F. Kennelly |

**PLAINTIFF'S[1] RESPONSE TO THIS COURT'S MINUTE ENTRY OF DECEMBER 13, 2019 ORDERING THE PARTIES TO PROVIDE FURTHER INFORMATION IN SUPPORT OF MOTION TO APPROVE *CY PRES* DESIGNEES**

**I.      Introduction**

This matter addresses a class action settlement and the distribution of the remaining settlement funds. On December 6, 2019, the Parties, Plaintiff Wendell H. Stone Company, Inc. ("Stone" or "Plaintiff") and LKQ Corporation ("LKQ" or "Defendant"), filed an Agreed Motion to Approve *Cy Pres* Designees. (Dkt. 40.) On December 13, 2019, the Court vacated the hearing on the Parties' motion in a Minute Order stating:

> MINUTE entry before the Honorable Matthew F. Kennelly: The 12/19/2019 hearing date on the agreed motion to approve cy pres designees is vacated at the Court's instance. The motion discloses that $261,000 in undistributed funds remains. Before the Court will consider distribution of the remaining settlement funds to cy pres designees, the parties are going to have to do more to convince the Court that a thorough and adequate effort has been made to get checks to the class members in a way designed to maximize the likelihood they would be negotiated. This has not been done at this point. The parties are directed to supplement the motion to provide at least the following information, along with

---

[1] Settlement Class Counsel and Counsel for Defendant have discussed and agreed-to the contents of this submission, including the conclusion that the Parties have made reasonable efforts to locate Settlement Class Members and direct settlement checks to them.

1

> any other information that might assist the Court in deciding the motion: the number of class members to whom checks were sent; how the addresses for class members were determined for the first mailing; what the envelope and the enclosures looked like; the amount of each distribution; what percentage of the class members failed to negotiate the checks initially; how many were returned undeliverable; what <u>exactly</u> was done to attempt to send or resend checks to those who had not negotiated them, or to otherwise locate them; what, if anything was done differently with regard to the second mailing (including what the envelope and enclosures looked like); comparison to other similar cases in terms of the percentage of unnegotiated checks; and the assessment of counsel for both sides regarding why such a large amount of settlement funds remain unclaimed. This supplement is to be filed by 12/20/2019. The motion is entered and continued for hearing on 1/10/2020 at 9:30 AM. (mk)

(Dkt. 43.) (Emphasis in original).

This supplemental brief responds to and addresses the Court's concerns. Respectfully, while the remaining settlement funds may seem like "such a large amount", in truth it represents only 12.29% of the settlement funds that were paid out to class members—**87.71% of the settlement funds intended to be paid to class members were successfully delivered and negotiated**. The remaining $276,331.44 represent only 8.46% of the entire settlement fund (which was $3,266,500 total). It should also be recalled that this was <u>not</u> a claims-made settlement: unlike settlements where class members are required to submit claim forms (where typically 3%-5% of the class end up receiving any type of financial renumeration), the instant settlement featured the automatic and direct mailing of checks to class members. No claim form was needed at all. As such, while a typical class action settlement sees upwards of 93% - 95% of unclaimed funds being directed to *cy pres* (or worse, reverting back to the class defendant), here that figure is nearly inverted: an overwhelming majority of the settlement class members (87.71%!) received their checks and negotiated them.

As such, and as explained further below, in the assessment of Plaintiff's Counsel the settlement model used in this case produced overwhelming benefits that went directly to class

2

members. $276,331.44 is undoubtedly a large sum of money, but the size of the residual here owes its existence to the fact that this settlement was a tremendous monetary victory for the 6,533 class members (approximately 5,683 of whom have cashed their checks). When coupled with the fact that every effort was made to locate and re-mail checks to the fraction of class members who had yet to cash them, there is little doubt that the Court has a sufficient basis upon which to Order the requested *cy pres* distribution. The Court's specific concerns, plus additional information, are addressed and provided below.

**II.     Argument**

    **A.     The number of class members to whom checks were sent; How the addresses for class members were determined for the first mailing; What the envelope and the enclosures looked like; and the amount of each distribution.**

On January 30, 2017, Kurtzman Carson Consultants ("KCC") received the settlement class list from the LKQ, which contained the client customer number, names, addresses, and primary phone number for 6,533 class member. (*See* Declaration of Scott DiCarlo ("DiCarlo Decl."), a true and accurate copy of which is attached hereto as Ex. A.)

Of the 6,522 members, 31 were missing mailing addresses, which KCC unsuccessfully attempted to locate a new address for by conducting a reverse phone search. (DiCarlo Decl. ¶ 2.) KCC then conducted a thorough search for updated mailing address for the remaining class members. (*Id.*) This search included processing the names and addresses of each class member through the National Change of Address Registry Database to ensure the address was up to date, which resulted in 146 updated addresses. (*Id.*) The result of this search yielded addresses for 6,502 class members. (*Id.*)

On June 31, 2017, after the mailing addresses had been updated, KCC sent settlement checks to 6,495 class members, or 99.42 percent of the class, distributing the entire net

settlement fund of $2,249,088.60[2] to the class members. (DiCarlo Decl. ¶ 3.) Each check was issued for approximately $346.28. (*Id.*) The settlement checks were sent to class members as a removable business check attached to a formatted letter. (*Id.* ¶ 4; *see also* "Example Letter," attached to the Dicarlo Declaration as Exhibit A.) The checks were sent in standard windowed envelopes via the United States Postal Service ("USPS"). (*See* "Example Envelope," attached to the Dicarlo Declaration as Exhibit B.)

> **B. The percentage of the class members failed to negotiate the checks initially; how many were returned undeliverable; what <u>exactly</u> was done to attempt to send or resend checks to those who had not negotiated them, or to otherwise locate them; what, if anything was done differently with regard to the second mailing (including what the envelope and enclosures looked like).**

As of October 31, 2017, ninety-days after the original issue date (when the first checks went stale), 1,105 uncashed checks remained totaling $382,639.40. (DiCarlo Decl. ¶ 5.) KCC also received a total of 469 checks returned as undeliverable by the USPS. (*Id.* ¶ 6.) KCC, via PacificEast, then used skip-trace technology to search checks returned as undeliverable for an updated address and re-mailed settlement checks where possible. (*Id.*)

On September 24, 2018, KCC informed the Parties that 1,069 checks remained uncashed totaling $370,173.32 (or approximately 16.4 percent of the class). (DiCarlo Decl. ¶ 7.) At this time, $1,878,915.28 of the $2,249,088.60 net settlement fund had been distributed to the class members. The Parties then instructed KCC to attempt to locate updated addresses for the 643 records that were not returned as undeliverable. (*Id.*) As detailed in the DiCarlo Declaration, KCC conducted an extensive, manual search of publicly available information, which included assigning two staff—a Senior Project Manager and a Project Manager—to conduct internet searches to determine whether new addresses could be found. (*Id.* ¶ 8.) This required

---

[2] This net settlement fund equaled the $3,266,500 total fund less the costs of notice and administration as well as Court-approved attorneys' fees and costs.

approximately 50 hours of time. (*Id.*) As a result of this manual search, KCC was able to locate an updated address for 515 of the records. (*Id.* ¶ 9.) On May 17, 2019, KCC conducted a second mailing of settlement checks to 512 class members. (*Id.* ¶ 7.)

As of December 19, 2019, only 798 checks (out of 6,495 originally mailed) remained uncashed totaling $276,331.44. (DiCarlo Decl. ¶ 11.) Thus, 87.71 percent of the class members have successfully negotiated their settlement checks, totaling $1,972,777.16.

Nothing was changed about the appearance of the envelope or the letter with a detached check for the remailings. It is telling that over 87% of the class members who received the mailings were able to successfully negotiate their checks.

    **C.    Comparison to other similar cases in terms of the percentage of unnegotiated checks; and the assessment of counsel for both sides regarding why such a large amount of settlement funds remain unclaimed.**

87.71 percent of the net settlement fund has been successfully distributed to class members. The fund was distributed in equal payments of $346.28. This represents a terrific result for the class and is directly attributable to the choice of the Parties to implement a direct payment settlement process—wherein class members receive checks automatically with no need to complete and submit paper or electronic claim forms.

The allure of a settlement process that foregoes a claim form in favor of direct payments is that a substantially higher percentage of class members are likely to receive actual, tangible monetary payments. *See Lee v. Ocwen Loan Servicing, LLC*, 2015 WL 5449813, at *17 (S.D. Fla. Sept. 14, 2015) ("[A] direct payment structure would obviously result in more, and possibly all, class members receiving a share of the monetary relief in the settlement."); *see also GMAC Mortg. Corp. of Pa. v. Stapleton*, 236 Ill. App. 3d 486, 491, 603 N.E.2d 767, 772 (1992) (resolving objection to class settlement by removing requirement of claim form in favor of direct

payments). In short, direct payment settlement procedures are generally preferred to a "claims made" process. *See Vought v. Bank of America*, N.A., No. 10-CV-2052, 2013 WL 269139, at *6 (C.D. Ill. Jan. 23, 2013) (describing switch from claims process to direct payments as an "enhancement of the settlement does not require new notice to be issued.").

This is largely because "claims made" settlements—wherein class members are tasked with the burden of filing claim forms—frequently result in a smaller percentage of class members actually receiving a share of the settlement. *See Sylvester v. CIGNA Corp.*, 369 F.Supp.2d 34, 52 (D. Me. 2005) (explaining that claims made settlements regularly yield response rates of 10 percent or less.). Indeed, TCPA settlements (and consumer class actions more generally) typically achieve claims rates between 3 and 5 percent. *See Ferrington v. McAfee, Inc.*, 2012 WL 1156399, at * 13 (N.D. Cal. Apr. 6, 2012) ("'[T]he prevailing rule of thumb with respect to consumer class actions is 3–5 percent.'"); *see also In re Capital One Telephone Consumer Protection Act Litig.*, 80 F.Supp.3d 781, 809 (N.D. Ill. 2015) (approving TCPA settlement with 7.87% claim rate); *see also Rawa v. Monsanto Company*, 2018 WL 2389040, at *11 (E.D. Mo. May 25, 2018) (approving "high" claims rate of 13%); *see also Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215 (N.D. Ill. 2016) (approving TCPA settlement with 1.08% claim rate); *see also Couser v. Comenity Bank*, 125 F.Supp.3d 1034, 1044 (S.D. Cal. 2015) (approving a TCPA settlement with "a higher than average claims rate of 7.7%.").

Taking the very strongest of these sample take rates—13%—that would have resulted in 87% of the class receiving no monetary payment and the remaining monies (which would have equaled approximately $1.9 million) being distributed to *cy pres* (assuming no reverter was negotiated). Here, the inverse occurred: due to the direct payment structure, 87.71% of the instant class received monetary benefits and only 12.29% is slated for *cy pres*. Consequently, had

6

class members been required submit claims forms to obtain settlement payments, it is not unthinkable that 87 percent (or more) would not have received a share of the settlement fund—though it is admittedly likely that the 13% who did file claims would cash their checks at a *slightly* higher rate.

To be sure, direct-payment settlements are not without their drawbacks: "A direct-payment structure without the Claim Form providing current addresses risks fraud and waste in administering the Settlement." *Braynen v. Nationstar Mortg., LLC*, No. 14-CV-20726, 2015 WL 6872519, at *14 (S.D. Fla. Nov. 9, 2015) (citing *In re Educational Testing Serv. Praxis Principles of Learning & Teaching*, 2006 WL 3332829, at *2 (E.D. La. Nov. 15, 2006) (overruling objection that claims process is unneeded "because the names and addresses of [class members] are known," finding that a claims process prevents checks from being mailed to unverified and old addresses, reducing undeliverable mail and fraudulently cashed checks)). Here the administrative burden has been increased due to the fact these checks were mailed to small businesses that hadn't previously heard of the lawsuit and had never requested such funds be mailed to them. It is entirely reasonable for ordinary consumers to be suspicious of checks that simply arrive in the mail with a letter.

Nevertheless the fact remains: 798 checks remain uncashed totaling $276,331.44. This is to be expected—it is not uncommon for a significant amount of the settlement checks to go remain uncashed in class action settlements. *See Highland Homes Ltd. v. State*, 448 S.W.3d 403, 405 (Tex. 2014) (citing Ethan D. Millar & John L. Coalson, Jr., *The Pot of Gold at the End of the Class Action Lawsuit: Can States Claim It as Unclaimed Property?*, 70 U. Pitt. L.Rev.. 511, 514 (2009) ("It is not uncommon in class action settlements for a significant amount of the settlement checks to never be cashed."). While the $276,331.44 these 798 checks represent appears

substantial in isolation, it is actually a relatively small percentage of the total settlement fund: again, it totals only 12.29 percent. Meanwhile, $1,972,757.16 has actually been paid out to over 87% of the class members (approximately 5,725 class members).

There are several potential reasons why this small group—12.29% of the class—did not negotiate their checks. The most likely reason is that the class in this case was comprised predominantly of small businesses that received Defendant's faxes—many of which fail or close up shop every year. A portion of the checks were necessarily issued to old business names for which there isn't a current operator. In such cases, where no one contacted Settlement Class Counsel to discuss re-issuing checks to a new business name or the former business owners personally, it is likely that the checks weren't negotiated because, by virtue of the business closing, there was no one to negotiate the funds. There are also persons who, for whatever reason, don't trust checks that simply arrive in the mail, even if Class Counsel explained the origins of the payment. And then there are folks who may have disagreed with the Settlement. Whereas under a claims-made structure such persons can (among other ways) voice their disapproval of the case or its resolution by simply refusing to file a claim, in a direct payment settlement the comparable act is to not cash the check. Class Counsel has fielded a range of inquiries over the past year regarding settlement checks, and many people were at first naturally suspicious of the checks. Class Counsel worked diligently with the class members and the administrator to ensure prompt reissues.

As a final point, the percentage of unclaimed checks here align with settlements in other cases. (*See* DiCarlo Decl. ¶ 12, 13.) As explained by the Administrator:

> KCC has served as the administrator for similar matters. In a project that required a claim be filed to obtain a payment, *Lary, et al. v. Rexall Inc., et al.*, 89.15% of checks have cashed as of December 19, 2019. In *Degen v. Zimmer Dental, Inc.*, another similar matter with claims filed, the check cashing rate was 96.10% as of

8

> August 29, 2016. In *Abramson v. CWS Apartment Homes*, checks were issued to class members without the need to file a claim. As of December 19, 2019 the percentage of class members who successfully cashed their settlement checks was 72.21%.

(*Id*.) For the *Lary* and *Degen* matters, the percentage of checks cashed was higher: these checks, after all, were mailed to persons who had specifically requested them. Of course, however, fewer class members are benefitting overall since the claims rates in those cases are nowhere near 87%. Rather, *Lary* is at approximately 5% and in *Degen* the take rate was approximately 10%. (DiCarlo Decl. ¶ 12.) Hence, a far smaller percentage of the settlement class actually receives funds, but they negotiate the checks they have requested at a slightly better clip. Due to the lack of a claim form, this settlement is more akin to *Abramson*, and here 16% more of the class members (87% vs. 72%) than in *Abramson* have negotiated their checks. (*Id.* ¶ 13.) As such, a far larger percentage of the class has received benefits in this case and in *Abramson* than in *Lary* or *Degen*.

In short, while $276,331.44 may seem like a large residual, in reality it's not: overall it represents a small percentage of the net settlement fund, which itself was exceptionally large given the number of class members involved in this case. Rather than present the Court with a claims-made settlement—which would've resulted in perhaps 13% of the class making claims (where hopefully 96% of that 13% would've cashed their checks) coupled with a truly large (87%-88%, or nearly $1.9 million) residual—here over 87% of the class cashed their checks leaving the Parties and the Court with what is actually a reasonable amount of unclaimed funds.

### D. Plaintiff remains willing to oversee additional rounds of mailings if the Court so Orders.

Even though the facts demonstrate that the percentage of the class receiving monetary benefits here far outshines class settlements where a claim form is required, and notwithstanding

9

the fact that the Parties have attempted multiple rounds of mailing checks out, Class Counsel remains committed to seeing this settlement through to its completion and to the Court's satisfaction. As such, if the Court determines that 87.71% is insufficient or that another mailing (or two) is required, Class Counsel will again work with the administrator and counsel for the defendant to conduct a re-mailing, and will make any necessary adjustments to the letter or envelope to increase the probability the check is negotiated. The amounts of the checks will necessarily decrease by the increased administrative costs. Class Counsel of course wants to direct as much of the funds as possible into the actual hands of class members—it is for that very reason that the instant framework was secured at the Parties' mediation overseen by Magistrate Judge Denlow which has resulted in <u>87%</u> of the class receiving direct payments.

### III. Conclusion

The Court should find that the Parties have made an adequate effort to distribute settlement funds and that they have provided a sufficient basis from which the Court can order the distribution of the *cy pres* funds. Indeed, 87.71 percent of the class received payments—a fantastic result. As such, the Court should approve the distribution of the remaining 12.29 percent of the fund to the *cy pres* designees and direct the Settlement Administrator to timely remit such funds. In the alternative, Plaintiff and Class Counsel remain willing to make all necessary efforts to push the take rate even higher in the event the Court determines additional mailings are required.

Counsel for Plaintiff                                    Counsel for Defendant

 /s/ Steven L. Woodrow                                    /s/ George R. Dougherty

Steven L. Woodrow                                        George R. Dougherty
(swoodrow@woodrowpeluso.com)                             (gdougherty@shb.com)

Patrick H. Peluso
(ppeluso@woodrowpeluso.com)*
Woodrow & Peluso, LLC
3900 East Mexico Ave., Suite 300
Denver, Colorado 80210
Telephone: (720) 213-0675
Facsimile: (303) 927-0809

Marc McCallister
(mmccallister@gmail.com)
Gary D. McCallister & Associates
120 North LaSalle St., #2800
Chicago, Illinois 60602
Telephone (312) 345-0611

*pro hac vice

Shook Hardy & Bacon LLP
111 S. Wacker Dr.
Suite 4700
Chicago, Illinois 60606

**CERTIFICATE OF SERVICE**

  The undersigned hereby certifies that on December 20, 2019, I served the above and foregoing papers by causing such paper to be filed with the Court using the Court's electronic filing system, which will send copies of such paper to all counsel of record.

            /s/ Steven L. Woodrow